NATIONAL SMALL SHIPMENTS TRAFFIC CONFERENCE, INC. and Drug and Toilet Preparation Traffic Conference, Inc., Petitioners,*

v.

CIVIL AERONAUTICS BOARD, Respondent,*

Animal Shipper Parties, Flying Tiger Line Inc., Trans World Airlines et al., Our Animal Wards, and Shippers National Freight Claim Council, Inc., Intervenors.

No. 78–2163.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1979.

Decided Feb. 11, 1980.

* Consolidated with the following cases (identified by this circuit's case number and petitioner), in all of which the Civil Aeronautics Board is the respondent: No. 78–2164, National Industrial Traffic League; No. 78–2187, Trans World Airlines et al.; No. 78–2202, Council for Safe Transportation of Hazardous Articles; and No. 78–2308, Air Transport Association of America.

Renee D. Rysdahl, Washington, D. C., with whom John F. Donelan, Frederick L. Wood, Daniel J. Sweeney, and Steven J. Kalish, Washington, D. C., were on brief, for petitioners National Small Shipments Traffic Conference, Inc. et al. in Nos. 78–2163 and 78–2164.

Gerry Levenberg, Washington, D. C., for petitioners (intervenors in Nos. 78–2163 and 78–2164) Trans World Airlines et al. in No. 78–2187.

Lawrence W. Bierlein, Washington, D. C., was on brief for petitioner Council for Safe Transportation of Hazardous Articles in No. 78–2038.

David R. Murchison, Washington, D. C., with whom James E. Landry, Washington, D. C., was on brief, for petitioner Air Transport Association of America in No. 78–2308.

Thomas L. Ray, Atty., Civil Aeronautics Board, Washington, D. C., with whom Gary J. Edles, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, and Robert L. Toomey, Atty., Civil Aeronautics Board, and John J. Powers, III and Daniel J. Conway, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondent. Barry Grossman and William D. Coston, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent.

N. Marshall Meyers, Washington, D. C., was on brief for intervenor Animal Shipper Parties. Richard N. Bagenstos, Washington, D. C., also entered an appearance for intervenor Animal Shipper Parties.

J. W. Rosenthal, Washington, D. C., was on brief for intervenor Flying Tiger Line Inc. Joel Stephen Burton, Washington, D. C., also entered an appearance for intervenor Flying Tiger Line Inc.

Rotraud M. Perry, Washington, D. C., was on brief for intervenor Our Animal Wards.

William J. Augello, Huntington, N. Y., was on brief for intervenor Shippers National Freight Claim Council, Inc. Charles Ephraim and James F. Flint, Washington, D. C., also entered appearances for intervenor Shippers National Freight Claim Council, Inc.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and ROBB, Circuit Judge.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

These consolidated cases are petitions for review of three provisions of the Civil Aeronautics Board's (CAB or Board) comprehensive general regulations governing domestic air cargo transportation. ER–1080, 14 C.F.R. § 291 (1979). The challenged rules exempt domestic air cargo carriers from (1) the duty to file tariffs with the CAB showing the carrier's rates, rules, and practices for cargo transportation, imposed by Section 403(a) of the Federal Aviation Act (the

Act), 49 U.S.C. § 1373(a) (1976); (2) the duty to provide air transportation service upon reasonable request—the statutory duty to carry—imposed by Section 404(a)(1) of the Act, 49 U.S.C. § 1374(a)(1) (1976); and (3) the statutory provisions relating to the filing of inter-carrier agreements affecting domestic air transportation, Pub.L. No.95–504 §§ 28(a) and 30(a). The petitioners [1] contend that the CAB exceeded its authority under the statute in promulgating the challenged regulations, and that the decision to adopt the regulations was arbitrary and capricious.

## I

These cases arise against a background of fundamental changes in Congress' approach to the air transportation industry. For over forty years, under the Federal Aviation Act, 49 U.S.C. § 1301 *et seq.* (1976) (and its predecessor, the Civil Aeronautics Act of 1938, 52 Stat. 977), the industry was subjected to a system of detailed economic regulation which this court has characterized as "severely anticompetitive." *United States v. CAB,* 511 F.2d 1315, 1322 (D.C.Cir. 1975). Under Section 401(a) of the Act, 49 U.S.C. § 1371(a), no person could engage in air transportation without first obtaining a certificate of public convenience and necessity from the CAB. Once certified, a carrier was obliged "to provide and furnish * * air transportation, as authorized by its certificate, upon reasonable request therefor * * *." Section 404(a), 49 U.S.C. § 1374(a). Carriers were required to set forth their rates, rules, and practices in tariffs filed with the CAB and to comply strictly with these tariffs. Section 403, 49 U.S.C. § 1373. The Board was authorized to proscribe any existing or proposed rates, rules, and practices that were or would be unjust or unreasonable. Section 1002(d), 49 U.S.C. § 1482(d). Proposed changes in carrier rates had to be filed with the Board at least 30 days before the intended effective date. Section 403(c), 49 U.S.C. § 1373(c). The Board could suspend these proposed rates for up to six months while it considered whether they were unjust or unreasonable. Section 1002(g), 49 U.S.C. § 1482(g). Various kinds of corporate transactions involving airlines were also subject to Board regulation. For example, no one could acquire control of an air carrier without prior Board approval. Section 408(a)(5), 49 U.S.C. § 1378(a)(5). And any agreement between two or more airlines concerning cooperative working arrangements had to be submitted to the Board for approval. Section 412, 49 U.S.C. § 1382. Transactions approved by the Board under Sections 408 and 412 were automatically exempt from the antitrust laws. Section 414, 49 U.S.C. § 1384. The economic regulatory provisions of the Act were not in fact applied to all air carriers. Acting under authority granted it by Section 416 of the Act, 49 U.S.C. § 1386,[2] the Board established a classification of air carriers designated "air taxi operators" which were exempt from most of these provisions of the

---

1. The petitioners are the National Small Shipments Traffic Conference, Inc. and the Drug and Toilet Preparation Traffic Conference, Inc. (No. 78–2163); the National Industrial Traffic League (No. 78–2164); the Council for Safe Transportation of Hazardous Articles (No. 78–2203); Trans World Airlines, American Airlines, Delta Air Lines, Northwest Airlines, Western Air Lines, Allegheny Airlines, and North Central Airlines (petitioners in No. 78–2187 and intervenors in Nos. 78–2163 and 78–2164); and the Air Transport Association of America (No. 78–2308).

  Flying Tiger Line Inc., Our Animal Wards, Shippers National Freight Claim Council, Inc., Pet Farm, Inc., Gators of Miami, Inc., Docktor Pet Centers, Inc., Primate Imports, Inc., Pet Industry Joint Advisory Council, Midwest Professional Pet Distributors, Inc., International Bird Institute, Engle Laboratory Animals, Inc., and Country Kennels, Inc. are intervenors in Nos. 78–2163 and 78–2164.

2. Section 416(b) provided:

  The Board * * * · may * * * exempt from the requirements of this subchapter or any provision thereof * * * any air carrier or class of air carriers, if it finds that * * * enforcement * * * is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest.

Act.[3] 14 C.F.R. § 298 (1979). Air taxi operators were restricted as to the size of the planes they could operate.

Major changes in the approach to the domestic air cargo transportation industry were signaled by the enactment of the cargo deregulation legislative amendments to the Federal Aviation Act, Pub.L.No.95–163, 91 Stat. 1278.[4] The amendments completely overhauled the provisions of the Act pertaining to air cargo transportation. Congress stated that "encouragement and development of an integrated transportation system relying upon competitive market forces to determine the extent, variety, quality, and price of such services" is in the public interest. Section 102(b)(2), 49 U.S.C. § 1302(b)(2) (Supp. I 1977). A new certification procedure was established, under which virtually any United States citizen could obtain authorization to provide domestic all-cargo transportation, without restrictions as to places served or rates charged. Section 418, 49 U.S.C. § 1388 (Supp. I 1977). Moreover, the cargo deregulation legislation terminated the Board's authority to find interstate air cargo rates, rules, and practices unjust and unreasonable and to prescribe new rates, rules, and practices in their stead. However, the Board may still find rates unlawful after investigation, on grounds that they are unjustly discriminatory, unduly preferential or prejudicial, or predatory, and the Board has the authority to suspend any such rates while it investigates them. Section 1002(d)(3) and (g), 49 U.S.C. § 1482(d)(3) & (g) (Supp. I 1977). Finally, the amendments empowered the Board to exempt carriers operating under the new Section 418 certificates from "section 1371(a) of this title, and any other section of this chapter which the Board by rule determines appropriate * * *." Section 418(c), 49 U.S.C. § 1388(c) (Supp. I 1977).

## II

### A. The Proposed Regulations

In order to determine the ground rules that would govern the provision of domestic air cargo transportation under the new regime, the Board initiated the rulemaking proceedings leading to the regulations challenged by these petitioners. The Board's notice of proposed rulemaking set forth proposed rules on a variety of issues. Many of these proposals were substantially adopted in the final regulations and are not challenged by the petitioners in these cases.

Pertinent for our purposes was the Board's proposal to exempt air cargo carriers from the tariff and agreement filing requirements and the duty to carry provisions of the Act. The Board pointed out:

> The Congress clearly intended Pub.L. 95–163 to substantially deregulate the domestic air cargo industry. By positive statutory language, Congress completely revoked the core elements of the Board's regulatory powers over domestic air freight: its ability to control entry and exit, and its ability to set or control rates by analyzing the relationship between those rates and carrier costs. To complete the task of deregulating air freight, however, Congress delegated to the Board considerable discretion. * * *

Joint Appendix (JA) 1.[5]

The Board noted that the literal language of its exemption authority under the Act

3. Air taxi operators were exempt from the certificate requirement of § 401(a), the tariff requirements (with limited exceptions) of § 403, the statutory duty to carry imposed by § 404(a), and (with limited exceptions) the obligation to file inter-carrier agreements with the Board imposed by § 412.

4. The cargo deregulation provisions of Pub.L. No.95–163 were added on the floor of the Senate to a House bill involving a war risk insurance program. H.R. 6010, 95th Cong., 1st Sess. (1977). The Conference Committee agreed to retain the cargo deregulation provisions in the final bill, which then passed both houses (without debate in the Senate). As a result, there are no committee reports on the cargo deregulation provisions other than the Conference Report, H.R.Rep.No.95–773, 95th Cong., 1st Sess. (1977).

5. The Board noted that its expanded exemption authority under § 418 only applies to carriers operating under authority of § 418 certificates, i. e., carriers providing all-cargo service. However, most of the nation's air freight is moved

covered the proposed rules. It acknowledged that the Conference Report on the cargo deregulation legislation had stated:

> [T]he Managers do not contemplate that the Board will exempt carriers from the requirement of filing tariffs. Tariffs provide valuable notice of rates to users of air transportation. Tariffs will be necessary for the Board to effectively carry out its duties to determine whether rates for the transportation of property are discriminatory, preferential, prejudicial, or predatory.

H.R.Rep.No.95–773, 95th Cong., 1st Sess. 14–15 (1977) (Conference Report). The Board reasoned, however, that "tariff filing is inconsistent with the overall scheme of the legislation which was intended to deregulate entry and pricing of air freight." JA 5. Moreover, there are other, less restrictive, procedures available which can perform the functions that the Conference Report ascribed to tariff filing.

First, abolishing the tariff filing requirement would not prevent carriers from continuing to disseminate tariff information in much the same manner as before. And the economic self-interest of the carriers would ensure that tariff information is made available to potential customers.[6] The Board pointed out that shippers have received adequate tariff information from air taxis which have been exempt from the filing requirement. Second, abolishing tariff filing would not affect the Board's rate policing functions. The Board noted that it could not prevent a carrier from putting a discriminatory rate into effect since it no longer had the authority to suspend rates.

As such there was no need to retain the requirement of advance filing of rates. In addition, investigation of alleged discriminatory rates was usually in response to complaints by carriers or shippers rather than Board monitoring of carrier tariffs. Thus abolishing the filing requirement would not compromise the Board's ability to fulfill its rate policing responsibilities. Finally, the Board reasoned that a continuation of the tariff requirement could interfere with Congress' policy of letting market forces determine the price and quality of air cargo transportation. Theoretical evidence suggested that a system of advance notice of prices which are binding results in prices which are higher than they would otherwise be. Moreover, this system inhibits price competition. And, because tariff prices and conditions are automatically part of the contract of carriage, the Board expressed concern that carriers might be able to limit their liability merely by filing exculpatory rules with the Board. JA 5.

The Board explained that its proposal to exempt carriers from the statutory duty to carry was based on the "tentative view that this 'duty,' too, should be a matter of normal commercial decision-making rather than a thing determined under the law." JA 6. The Board invited interested parties who were opposed to this exemption to aid it by explaining why the revenue from any particular type of traffic, or traffic to or from any particular place, would not provide sufficient incentives to carriers to provide service. *Id.*

Finally, the Board suggested that its proposal to terminate the requirement that

---

by carriers providing combination service (both passengers and cargo) under § 401 certificate authority. The Board saw no reason to treat the two types of carriers differently, and indeed was concerned that any difference in treatment could inhibit competition and hinder development of an efficient air cargo transportation system. The Board therefore proposed to use its authority under § 416(b), 49 U.S.C. § 1386(b), see note 2 *supra*, to exempt combination carriers from provisions of the Act to the same extent that all-cargo carriers were granted exemptions under § 418(c).

**6.** The Board pointed out:

> It is extremely unlikely that carriers will keep their prices "secret." In fact, a carrier's ability to successfully market its services to the public depends in part on its success in informing potential customers what its charges will be and what services it offers: Large shippers will undoubtedly continue to want their own copies of the carrier's current rate sheets, and infrequent shippers should continue (as they do now) to use the telephone to find out what the carrier's charges will be for a particular shipment. * * *

JA 5.

carriers file inter-carrier agreements with it, and the consequent elimination of the antitrust immunity conferred by Board approval of such agreements, was more consistent with Congress' new approach to the industry. Given the new regime of competition, there was no reason why the industry agreements should not be subjected to the full force of the antitrust laws. JA 6–7. The Board requested comments on the proposed rules from interested members of the public.

## B. *Airline Deregulation Act of 1978*

During the comment period Congress enacted the Airline Deregulation Act of 1978, Pub.L.No.95–504, 92 Stat. 1705, which substantially revised the entire Federal Aviation Act. In light of the earlier deregulation of the domestic air cargo transportation industry, most of these revisions had little direct impact on air cargo service. However, the Act's sunset provisions will affect cargo transportation since they abolish the Board itself on January 1, 1985, Pub.L.No.95–504 § 40(a). In addition, the Deregulation Act substantially broadened the CAB's Section 416(b) exemption authority. Where previously the Board had been required to find that because of "an undue burden * * * by reason of the limited extent of, or unusual circumstances affecting, the operations of [the] carrier" enforcing the requirement "is not in the public interest," Section 416(b), 49 U.S.C. § 1386(b) (1976), it could now grant an exemption merely upon finding that it "is consistent with the public interest" to do so. Pub.L. No.95–504 § 31(a). In addition, Sections 412 and 414, 49 U.S.C. §§ 1382 and 1384 (1976), were revised to provide that carriers *may* file agreements for Board approval, and the Board *may*, if it approves, relieve the parties to the agreement from antitrust liability upon finding such immunity "required in the public interest." Pub.L.No. 95–504 §§ 28(a) and 30(a).

## C. *Public Comments*

The Board received a substantial number of comments on the proposed rules from carriers, shippers, freightforwarders, government agencies, and interest groups. In order to provide a further opportunity for public participation, the Board heard oral argument from 41 parties on October 19, 1978.

The certificated carriers generally endorsed the Board's attempt to lessen air cargo transport regulation, including the elimination of the duty to carry. Most, however, opposed the proposal to abolish the tariff filing requirement.[7] The shippers objected to various sections of the proposed rules, particularly the proposals to exempt carriers from the tariff filing requirement and the statutory duty to carry.[8] Comments supporting the proposed rules were submitted by the Department of Justice and a number of small carriers.[9] The only comment on the Board's proposal to exempt carriers from the agreement filing requirement and terminate antitrust immunity for approved agreements was submitted by the Department of Justice which endorsed the proposal.[10]

## D. *The Final Regulation*

On November 8, 1978 the Board adopted Regulation ER–1080, *Operating Rules for All-Cargo Carriers and Domestic Cargo Transportation by Section 401 and 418 Carriers*, which reissued Part 291 of its Economic Regulations titled *General Rules for All-Cargo Carriers*, 14 C.F.R. Part 291 (1979). Insofar as is pertinent for our purposes, the Board adopted the proposal to exempt carriers from the agreement and tariff filing requirements and the statutory duty to carry.

---

7. *See, e.g.*, JA 162–167 (Reply Comments of Delta Air Lines, Inc.).

8. *See, e.g.*, JA 28–41 (Comments of National Small Shipments Traffic Conference, Inc. and Drug and Toilet Preparation Traffic Conference).

9. JA 42–50 (Comments of the United States Department of Justice); *e.g.*, JA 125–127 (Comments of Commuter Airline Association of America); JA 176 (Reply Comments of Commuter Airline Association of America).

10. JA 46–49.

In explaining its decision to grant the tariff filing exemption, the Board reiterated the arguments it made in the original proposal.[11] It further noted that the experience of the air taxi operators confirms its prediction that economic incentives will ensure that air carriers continue to make adequate tariff information available to the public.[12] While noting that shippers were opposed to the proposal, the Board pointed out that the shippers' opposition could not be determinative because it is the ultimate consumer who "pays for the inefficiencies and restrictions created by tariffs." JA 271. The Board also established a requirement that carriers retain "rate sheets, contracts reflecting special prices, and airway-bills * * * for a period of 1 year" in order to provide the documentation that would enable the Board to monitor pricing practices. JA 271. Finally, the Board suggested that eliminating tariff filing would provide "a preliminary test of the Congressionally mandated elimination of tariffs for the passenger transportation industry in 1983" under the 1978 Act. JA 271.

The Board responded to suggestions that exempting carriers from the statutory duty to carry would encourage carriers to refuse to carry some kinds of cargo, such as live animals, by pointing out that "[w]ith unlimited entry into the air cargo industry, there is every reason to believe that all reasonable service needs will be met." JA 273. The Board also noted that although some air freight rates have increased since the deregulation amendments (particularly for the special items), this has been more than matched by substantial increases in available all-cargo service. JA 273. The Board observed that this exemption would enable the domestic cargo industry to be a testing ground for deregulation of the entire industry.

Finally, with respect to the exemption from the agreement filing requirement, the Board observed that the Deregulation Act of 1978 had broadened its Section 416(b) exemption authority and had "clearly direct[ed] the Board to move quickly toward a deregulated, competitive environment." JA 274. The Board therefore thought it appropriate to preclude the filing of agreements and thereby to terminate the immunity from the antitrust laws which might flow from Board approval of the agreements.

Before examining petitioners' challenges to the Board's regulations, we briefly consider the limits of our reviewing function.

### III

Our role as a reviewing court is a limited one. We must affirm the challenged regulations unless we find that the Board's decision was "arbitrary and capricious," 5 U.S.C. § 706(2)(A) (1976), or in excess of its statutory authority, *id.* § 706(2)(C), or adopted without observance of the procedure required by law, *id.* § 706(2)(D). The "arbitrary and capricious" standard of review is highly deferential. *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C. Cir.) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). It presumes that the agency's action is valid. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We may not substitute our judgment for the agency's, *id.* at 416, 91 S.Ct. at 822, and we must affirm the Board's regulations if a rational basis for the Board's decision is presented. *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *Ethyl Corp. v. EPA, supra,* 541 F.2d at 34. Of

---

11.  *See* 618 F.2d at 823–824 *supra.*

12.  The Board also noted that shippers who use air taxi operators have not suffered in resolving claims or other disputes, or from rapid price fluctuations, as comments suggested would happen if the Board granted the exemption. Only four complaints relating to rates were received by the Board in 1977, and four in the first seven months of 1978, about Federal Express, which carries about nine million packages per year. Furthermore, the same shippers who were arguing for retention of tariff filing had, through placing orders with the air taxis, helped increase scheduled air cargo transported by air taxis from 38,000,000 pounds in 1970 to 250,000,000 pounds in 1977. JA 271.

course this does not mean that our function is merely to rubberstamp the agency's decision. Rather, we must assure ourselves that the decision was "based on a consideration of the relevant factors," *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824, and "that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *Ethyl Corp. v. EPA, supra,* 541 F.2d at 35–36, *quoting Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). With these admonitions in mind, we turn to the challenges to the Board's rules.

## IV. THE TARIFF FILING EXEMPTION

The main challenge to the Board's regulation exempting carriers from the tariff filing requirement of Section 403 is presented by the seven airlines [13] (Air Carriers) who argue that the Board exceeded its statutory authority in granting the exemption, and that the Board's conclusion that granting the exemption is "in the public interest" is not supported by substantial evidence.[14]

### A

■ The Air Carriers concede, as they must, that the literal language of Sections 416(b) and 418(c) authorizes the Board to exempt carriers from the tariff filing requirement. However, they maintain that the language of the statute must be read in light of congressional intent, and that the available indications are that Congress did not intend the Board to use its exemption power in this manner. In support of their interpretation of Congress' intention the Air Carriers point to three things. First, they note that despite its move to deregulate the airline industry, Congress did not eliminate the tariff filing requirement.[15]

Second, they point to the passage in the Conference Report on the cargo deregulation amendments quoted above.[16] In petitioners view, it provides clear evidence that Congress wanted the Board to retain the tariff filing requirement. Finally, the Air Carriers maintain that the Board's action is inconsistent with the underlying goal of the Deregulation Act—the gradual transition to deregulation in strict accordance with the timetable specified by Congress, which does not include the abrupt and precipitous abrogation of the tariff filing requirement.

We do not agree with the claim that the Board exceeded its statutory authority. Sections 416(b) and 418(c) grant the Board very broad discretion. The latter authorizes the Board to exempt all-cargo carriers from "*any* * * * section of this chapter which the Board by rule determines appropriate * * *." 49 U.S.C. § 1388(c) (Supp. I 1977) (emphasis added). The former permits the Board to exempt "any person or class of persons" from "*the requirements* of this title or *any* provision thereof * * * if it finds that the exemption is consistent with the public interest." Pub.L. No.95–504 § 31(a) (emphasis added). Thus, as petitioners concede, the plain language of the statute authorizes the Board's action. A court interpreting a statute is bound by the "literal or usual meaning of its words" unless this would lead to " 'absurd results . . . or would thwart the obvious purpose of the statute' * * *." *Trans Alaska Pipeline Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed. 591 (1978), *quoting Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965). *See also United Air Lines, Inc. v. CAB,* 569 F.2d 640, 647 (D.C.Cir.1977). This case does not present an instance in which a literal interpretation of the language of the statute leads to an absurd result or conflicts with the obvious purpose of the Act. The basic purpose of the 1977 and 1978 amend-

---

13. *See* note 1 *supra.*

14. *See* note 20 *infra.*

15. Petitioners suggest that Congress deliberately chose to retain the tariff filing requirement,

pointing out that Congress has twice amended § 403(c) to lengthen the advance notice period for tariff changes.

16. *See* 618 F.2d at 827 *supra.*

ments to the Act was to deregulate the air transportation industry. Authorizing the Board to grant exemptions from any provision of the Act is quite consistent with, and indeed could further, that goal. Thus the literal language of the statute should control the disposition of this case. The Air Carriers would have us construe the statute in a manner that is inconsistent with its plain language. But as this court has previously noted, "We find no mandate in logic or in case law for reliance on legislative history to reach a result *contrary* to the plain meaning of a statute, particularly where that plain meaning is in no way unreasonable." *United Air Lines, Inc. v. CAB, supra,* 569 F.2d at 647 (emphasis in original).

Courts in the past have been able to rely on legislative history for important insights into congressional intent. Without implying that this is no longer the case, we note that interest groups who fail to persuade a majority of the Congress to accept particular statutory language often are able to have inserted in the legislative history of the statute statements favorable to their position, in the hope that they can persuade a court to construe the statutory language in light of these statements. This development underscores the importance of following unambiguous statutory language absent clear contrary evidence of legislative intent.

Our conclusion that the plain language of the statute should control is buttressed by the Air Carriers' inability to point to any *"clear contrary evidence* of legislative in-

tent." *Nat'l Railroad Passenger Corp. v. Nat'l Ass'n of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (emphasis added). The only credible support that petitioners offer is the statement in the Conference Report that the Conferees did not contemplate that the Board would grant exemptions from the tariff filing requirement.[17] This is not the type of clear indication of legislative intent that can justify a decision to disregard the plain language of a statute. The fact that the Conferees did not expect that the Board would use its exemption authority in a particular fashion does not indicate that Congress did not authorize the Board to act in this manner. It may well be that the statement in the Conference Report, particularly in light of the reasons given for the Conferees' expectation, was intended to ensure that the Board would reach a decision to grant exemptions from the tariff filing requirement only after very careful consideration.[18] We must assume that if Congress had intended to limit the Board's exemption authority in the manner suggested by the Air Carriers it would have said so in unmistakable language.[19]

### B

The Air Carriers also argue that the Board's tariff regulation must be overturned because the Board's conclusion that granting the exemption is consistent with the public interest is not supported by substantial evidence.[20] They maintain that the

---

17. Petitioners' suggestion that Congress' decision to retain the filing requirement, *see* text and note at note 15 *supra,* supports the claim that the Board was not authorized to exempt carriers from this requirement is without merit. The very purpose of the broad exemption authority given to the Board was to allow the Board to grant exemptions from those requirements of the Act that were not eliminated by the deregulation amendments.

18. As we have previously noted, the Board's decision to exempt carriers from the tariff filing requirement took into account the reasons that the Conferees gave for their expectation that the Board would retain the requirement. *See* 618 F.2d at 824 *supra.*

19. Congress enacted the Deregulation Act of 1978, which broadened the Board's exemption power under § 416(b), after the Board issued its notice of proposed rulemaking. It seems reasonable to assume that Congress was aware of the Board's proposal to exempt carriers from the tariff filing requirement. Surely, if Congress had wanted the Board's exemption authority limited in the manner that the Air Carriers suggest, it would have taken the opportunity presented by the Deregulation Act to say so.

20. The Air Carriers acknowledge that the customary review standard for informal rulemaking is the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A) (1976). They point out, however, that this court has embraced "the emerging consensus of the Courts of Appeals

Board's decision was based on "mere theoretical evidence and conjecture," and that the Board disregarded "a significant volume of evidence indicating the adverse impact of its new rules on the public interest." [21]

In support of their claim the Air Carriers start by challenging the Board's prediction that abolishing the tariff filing requirement will not diminish the amount of information that customers receive about air freight rates. They point out that the comments submitted by carriers and shippers indicate that the tariffs filed with the Board (disseminated through subscription services) have been the primary means through which they have kept abreast of rate changes. And they maintain that the Board's suggestion that the economic self-interest of the carriers will ensure that information about tariffs is disseminated to potential customers is pure conjecture. Next, the Air Carriers argue that the Board's claim that its ability to police discriminatory, preferential, prejudicial, or predatory rates does not depend on tariff filing is inconsistent with prior Board statements and actions and is contradicted by the comments submitted by shippers and carriers. Petitioners note that the Board has in the past acknowledged that tariff filing helps to preclude discriminatory treatment among customers of air carriers, and the Board has taken steps to assure wider dissemination of tariff information. In addition, the comments submitted by the shippers and carriers indicate that tariff filing plays a significant role in enabling detection of unlawful rates.

Petitioners also challenge the Board's conclusion that tariff filing inhibits price competition, contending that the only evidence in the record that supports this claim is an experimental study which, at best, is only tangentially related to the actual marketplace.[22] Finally, the Air Carriers, joined by intervenor Flying Tiger Line Inc., maintain that the Board's reliance on the experience of the air taxi industry in predicting the future performance of the domestic air cargo industry under its new regulations is misplaced. Petitioners suggest that air taxi operators offer only specialized services for restricted types of freight, allowing them to maintain very simple rate structures, and they carry a relatively insignificant amount of the total air freight traffic. Consequently, they argue, the performance of the air taxi industry is of little relevance in evaluating the future performance of the domestic air cargo industry and is not indicative of what may be expected as a result of the Board's new regulations.

In our view, the Air Carriers have not succeeded in showing that the Board's decision was arbitrary and capricious. As a preliminary matter, we note that the Air Carriers appear to have misunderstood the nature of the Board's decision and, consequently, the type of evidence necessary to show that the decision was arbitrary or capricious. The Air Carriers argue that the Board's decision must be supported by substantial evidence in the record. However, in concluding that abolishing the tariff filing requirement will increase price competition without depriving shippers of adequate rate information or precluding enforcement of the statutory ban on discriminatory rates, the Board made a determination that was "primarily of a judgmental or predictive nature * * *." *FCC v. Nat'l Citizens Committee for Broadcasting*, 436 U.S. 775, 813, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697

---

that the distinction between the arbitrary and capricious standard and substantial evidence review [5 U.S.C. § 706(2)(E) (1976)] is largely semantic," and has agreed that " 'when an agency engages in substantive rulemaking, it abuses its discretion (or acts arbitrarily and capriciously) if its actions are not supported by substantial evidence.' " *Pacific Legal Foundation v. Dep't of Transportation*, 593 F.2d 1338, 1343 n.35 (D.C.Cir.1979), *quoting Nat'l Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688,

705 (2d Cir. 1975) (Lumbard, J., concurring in the result).

**21.** Brief for Air Carrier petitioners at 42.

**22.** The proposed rules referred to the report of a study titled "Implications of Rate Filing for Domestic Dry Bulk Transportation on Inland Waters," by James T. Hong and Charles R. Plott, California Institute of Technology (1977).

(1978). For decisions of this sort, "complete factual support in the record for the [Board's] judgment[s] or prediction[s] is not possible or required; 'a forecast of the direction in which the future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" *Id.* at 814, 98 S.Ct. at 2122, *quoting FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *see Industrial Union Dep't, AFL–CIO v. Hodgson*, 499 F.2d 467, 474–475 (D.C.Cir.1974).[23] As a reviewing court, we may not substitute our judgment for the agency's. We must affirm the Board's decisions if they are rational, based on a consideration of all the relevant factors, and adequately explained. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 822. Our review persuades us that the Board's decision to exempt carriers from the tariff filing Requirement satisfies these tests.

We start by noting that the Air Carriers have not identified any flaws in the Board's reasoning. The Board's suggestion that tariff filing inhibits price competition does not seem irrational. The Senate Report on the 1978 Deregulation Act noted the anti-competitive effects of the advance filing provisions of the section.

> Carriers seeking to lower their prices are unable to gain a competitive edge since they must give advance notice of price changes to their competitors. * . * *

S.Rep.No.95–631, 95th Cong., 2d Sess. 3 (1978). And comments submitted by the shippers, urging the Board to retain tariff filing in order to avoid inter-carrier "price wars," confirm the Board's conclusion.[24] Also, the fact that shippers in the past relied on tariff filings for rate information is relevant but not dispositive. The crucial question is whether shippers will be able to obtain timely and accurate rate information if tariff filing is abolished. The Air Carriers have not shown that there is anything irrational about the Board's entirely reasonable prediction that carriers will not conduct business in a manner that will alienate the customers upon whom they depend for their livelihood.[25] As Flying Tiger Line Inc. (which joins in opposing the exemption) pointed out:

> Whether or not FTL is required to observe official tariffs filed with the Board, it will continue to publish its rates and conditions of carriage in much the same manner as before, and to change them only after advance notice. Thus insofar as FTL is concerned, the proposed exemption will have little, if any, practical effect on its method of doing business. *   *

JA 181 (Reply Comments of Flying Tiger Line Inc.).[26]

---

**23.** Petitioners are correct in suggesting that support from substantial evidence in the record may be necessary to sustain an informal rulemaking by an agency under the arbitrary and capricious standard of review. *See* note 20 *supra.* However, petitioners appear to ignore the fact that "an essentially legislative policy judgment," such as the Board's decision to grant the tariff filing exemption, is "not susceptible to the same type of verification or refutation by reference to the record as are some factual questions." *Industrial Union Dep't, AFL–CIO v. Hodgson*, 499 F.2d 467, 475 (D.C. Cir.1974). As we noted in *American Airlines, Inc. v. CAB*, 359 F.2d 624, 633 (D.C.Cir.) (*en banc*), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966):

> It is the kind of issue involving expert opinions and forecasts, which cannot be decisively resolved by testimony. It is the kind of issue where a month of experience will be worth a year of hearings.

**24.** *See, e.g.*, JA 23 (Comment of Eaton Corp.); JA 24 (Comment of Armour Dial, Inc.).

**25.** As Federal Express aptly put it at the oral hearing:

> [A]ny carrier who attempted to, over a sustained period of time[,] shuffle his rates too fast would probably find a backlash from shippers that was so severe as to force him to correct his ways.

JA 229.

**26.** The Department of Justice agreed with the Board that "[t]ariff filing requirements tend to perpetuate the inflexible ratemaking practices characteristic of regulated industries * * *." JA 44. The Department's comments also agreed with the Board's responses to the various concerns expressed by shippers about the impact of the proposal to exempt carriers from the tariff filing requirement. JA 44–45. Additionally, the commuter air carriers (*i.e.*, sched-

Furthermore, the experience of the air taxi industry—the only segment of the air cargo transportation industry that has operated without having to file tariffs with the Board—appears to bear out the Board's prediction. Whether or not the air taxis are fully representative of the whole industry, the significant point is that only the air taxis have operated in the type of competitive setting that the exemption is designed to promote. Accordingly, it was appropriate for the Board to look to the experience of the air taxis in its attempt to predict the impact of the proposal on other carriers.[27] Finally, we cannot challenge the Board's determination, based on its past experience in policing carrier rates, that requiring carriers to retain their rate records for one year will provide the documentation that the Board needs for investigations of allegedly discriminatory rates. For the foregoing reasons, we cannot agree with the Air Carriers' claim that the Board's decision to exempt carriers from the tariff filing requirement was arbitrary and capricious.[28]

## V. THE STATUTORY DUTY TO CARRY

The Board's decision to exempt carriers from the statutory duty to provide air transportation upon reasonable request is challenged by the National Small Shipments Traffic Conference, Inc. and the Drug and Toilet Preparation Traffic Conference, Inc. (Shippers) and by intervenor Our Animal Wards (Wards). Like the Air Carriers, these parties argue that the Board exceeded its authority under the statute, and that its decision was arbitrary and capricious.

### A

■ The Shippers' claim that the Board exceeded its statutory authority rests on the same reasoning as the similar claim by the Air Carriers discussed above,[29] and must fail for the same reasons that the Air Carriers' challenge was unsuccessful. The Shippers have failed to supply any clear evidence of a congressional intention to pre-

uled air taxi operators) stated that "tariff filing could hamper price competition" and "handicap the carriers' ability to price in response to market forces." JA 126 (Comments of Commuter Airline Association of America).

**27.** Taken to its logical conclusion, the Air Carriers' suggestion that the Board cannot terminate the tariff filing requirement without first showing that the experience of the carriers themselves indicates that they will continue to provide adequate service even if they are no longer required to file tariffs with the Board is absurd. Obviously, the Board could not acquire proof of this sort without first eliminating the tariff filing requirement. In the circumstances the Board did the next best thing: it looked to the experience of the air taxis. Furthermore, none of the distinctions between the regular carriers and the air taxis that the Air Carriers suggest shows why the Board's reliance on the latter's experience is misplaced. While it may be true that air taxis offer more limited service and that regular carriers have more complicated rate structures, it is nevertheless reasonable to assume that the economic incentives that have led the air taxis to make sure that their customers receive adequate rate information will have a similar effect on the regular carriers. *See* note 6 *supra.*

**28.** Intervenor Shippers National Freight Claim Council, Inc. (SNFCC) focuses its challenge to the Board's decision on the fact that it eliminat-

ed the requirement that carriers file their rules, regulations, and practices with the Board (as part of the tariffs). SNFCC claims that the Board does not have the authority to do this, and that the Board's decision was arbitrary and capricious. There is little merit to these claims. The Act authorizes the Board to grant exemptions from any of its provisions, and SNFCC has not pointed to anything in the legislative history that suggests otherwise. The Board reasonably concluded that since it no longer had the power to compel carriers to establish reasonable rules, it was appropriate to preclude the possibility of carriers attempting to limit their liability by filing exculpatory rules with the Board.

Intervenor Our Animal Wards (Wards) argues that tariff rules are necessary to assure safe transportation of animals. However, termination of the tariff filing requirement does not affect the carriers' duty to provide safe and adequate service. Section 404(a), 49 U.S.C. § 1374(a) (1976). A breach of that duty exposes a carrier to liability for any resulting injury. *See, e.g., Klicker v. Northwest Airlines, Inc.,* 563 F.2d 1310 (9th Cir. 1977). Thus we are not persuaded that Wards is correct in maintaining that tariff rules are necessary to guarantee safe transportation of animals.

**29.** *See* 618 F.2d at 826–827 *supra.*

clude the Board from using its broad exemption authority to exempt carriers from the statutory duty to carry.[30] Consequently, we see no reason why the plain language of the statute, which authorizes the Board to grant exemptions from any provision of the Act, should not control.[31]

## B

■ We also reject the Shippers' contention that the Board's decision to exempt carriers from the statutory duty to carry was arbitrary and capricious. For the most part, the Shippers' claim rests on their belief that the Board's action will encourage carriers to refuse to carry certain types of cargo, for example, live animals or radioactive materials. The Shippers maintain that carriers were reluctant to carry such cargo even before the Board exempted them from the duty to carry, that this reluctance was due to non-economic factors, and that there is thus no reason to believe the Board's prediction that the changes brought about by deregulation—such as freer entry into the industry—will help alleviate the problem of carrier refusals to carry certain types of cargo.

We note that although the Board specifically requested comments explaining why the revenue from any particular type of traffic would not provide sufficient incentives to influence carriers to carry such cargo, the Shippers failed to submit any such comments.[32] Given this, the Board reasonably concluded that the market system could be expected to resolve the problem of unpopular cargo under the more competitive conditions now allowed. We cannot say that this conclusion is irrational. Moreover, as the Board points out in its brief, it may well be the case that the Board's regulation of carrier rates contributed to the carriers' reluctance to handle certain types of cargo.[33] We therefore do not agree with the Shippers' claim that the Board's decision to exempt carriers from the duty to carry was arbitrary and capricious.[34]

30. The Shippers support their claim that Congress did not grant the Board the authority to exempt carriers from the statutory duty to carry by arguing that the examples of uses of the exemption power given in the Committee Reports on the deregulation amendments indicate that Congress intended to authorize Board action only in very limited circumstances, see H.R.Rep.No.95–1211, 95th Cong., 2d Sess. 18–19 (1978). S.Rep.No.95–631, 95th Cong., 2d Sess. 87–88 (1978). We do not agree. In the first place, the Shippers concede that the examples in the Committee Reports were not supposed to be all-inclusive. Brief for Shipper parties at 31. Second, if Congress had intended to grant the Board only the limited authority suggested by petitioners, it would have used more restrictive language in specifying the Board's exemption powers. It not having done so, we must assume it meant to permit the Board to grant exemptions from any provision of the Act.

31. See 618 F.2d at 827 supra.

32. The only reply to the Board's request that the Shippers are able to point to is a conclusory statement made by counsel for the Council for Safe Transportation of Hazardous Articles during the oral argument before the Board. JA 241.

33. Brief for respondent at 39.

34. The Shippers make two additional arguments which warrant little discussion. First, they claim that the Board ignored the requirement that it only grant exemptions that are consistent with the public interest. This assertion overlooks the Board's explicit finding that

[f]or the reasons stated below and in EDR–359, we find these exemptions to be consistent with the public interest under section 416(b), and to be appropriate under section 418(c) of the Act.

JA 269. Moreover, the Board's action conformed to Congress' directive that it consider "[t]he encouragement and development of an integrated transportation system relying upon competitive market forces to determine the extent, variety, quality, and price of [cargo transportation] services" to be in the public interest. Section 102(b)(2), 49 U.S.C. § 1302(b)(2) (Supp. I 1977).

Second, the Shippers complain that the Board has without due process eliminated a statutory cause of action for refusal to carry created by § 404. However, petitioners cite no cases that have held that there is such a cause of action, and it is far from clear that § 404(a) creates a private cause of action. Moreover, even assuming that it does, Congress did not limit the Board's exemption authority to only those statutory provisions that do not create private causes of action.

## VI. THE AGREEMENT FILING EXEMPTION

The Board's decision to terminate the filing of inter-carrier agreements under Section 412 is challenged by the Air Transport Association of America (ATA). ATA argues that the Board violated the Act, that its decision was arbitrary and capricious, and that the Board's rulemaking procedure failed to satisfy the minimum notice requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1976). Because it bears on the threshold question of whether it is appropriate for this court to consider ATA's objections, we will examine ATA's procedural claim first.

### A

Section 1006(c) of the Act, 49 U.S.C. § 1486(e) (1976), states that "[n]o objection to an order of the Board * * * shall be considered by the [reviewing] court unless such objection shall have been urged before the Board * * * or, if it was not so urged, unless there were reasonable grounds for failure to do so." *See Air Line Pilots Ass'n Internat'l v. CAB*, 502 F.2d 453, 457 (D.C.Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 (1975). ATA did not file any comments in response to the Board's notice of proposed rulemaking, and it did not participate in the oral argument before the Board. None of the participants in the rulemaking proceedings—including the carriers that are members of ATA—interposed any objections to the Board's proposal to terminate agreement filing.[35] Therefore, unless there are reasonable grounds for ATA's failure to urge its objections before the Board, the statute bars us from considering them.

■ ATA argues that there are reasonable grounds for its failure to raise its objections in the proceedings below. It claims that the Board's notice of proposed rulemaking was deficient in that it did not alert interested parties to the fact that the Board was planning to prohibit the filing of inter-carrier agreements. ATA suggests that the failure of any airline to file comments on this exemption merely confirms the inadequacy of the Board's notice,[36] and maintains that this deficiency not only provides reasonable grounds for its failure to present its objections to the Board, but also justifies a remand of the regulation.

Although the Board's notice may not have been a paragon of clarity, we agree with the Board that it should have given ATA sufficient notice about the Board's intentions. The stated purpose of the Board's proposal to exempt carriers from filing agreements was the termination of Board jurisdiction over these agreements and the consequent subjection of these transactions to the full force of the antitrust laws. JA 6–7.[37] The Department of Justice was able to understand the Board's intentions.[38] The Board was required to

---

**35.** The only comment on the Board's proposal was submitted by the Department of Justice which endorsed the proposal.

**36.** Petitioner also notes that even after the Board adopted the final rule exempting carriers from filing agreements, the Board staff continued to approve agreements submitted by carriers. ATA argues that this provides further evidence of the inadequacy of the notice given by the Board's proposal.

**37.** The Board's interim rules for cargo transportation had exempted § 418 carriers from the agreement filing requirement imposed by § 412. In adopting this exemption the Board explained:

We have concluded that the section 418 carriers should be exempted from these sections, but that their activities should be subject to the antitrust laws. We see no rea-

son—in the less regulated environment in which the section 418 carriers will be operating—for us to be required to approve each and every item falling within any of these sections, or to give these carriers an immunity which similarly situated unregulated companies cannot obtain. This result also seems most consistent with the expanded reliance on "competitive market forces" mandated by the new amendment to our policy statement * * *.

ER–1037 at 1, JA 316.

**38.** The Justice Department commented:

The Department enthusiastically supports the Board's proposal to subject domestic air cargo transportation mergers, interlocking arrangements and inter-carrier agreements to the rigorous scrutiny of the antitrust laws. JA 46.

give notice that was "sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Ethyl Corp. v. EPA, supra,* 541 F.2d at 48. In our view, the Board's notice satisfied this standard. Therefore, a remand of the Board's regulation on the ground that the Board did not give adequate notice is unwarranted. Moreover, although we have serious doubts about ATA's claim that there were reasonable grounds for its failure to present its objections to the Board, we have examined ATA's challenges to the Board's regulation. We find they are without merit.

■ ATA contends that the Board's rulemaking proceeding was deficient because the Board did not provide interested parties with an opportunity to comment on the impact of the 1978 Deregulation Act on the Board's proposals. The Deregulation Act was enacted shortly before the Board adopted the final rules. ATA maintains that the Deregulation Act drastically altered several of the provisions of the Federal Aviation Act on which the Board's notice of proposed rulemaking had been based. Accordingly, the Board, in ATA's view, should have issued a new notice of proposed rulemaking explaining how the Board planned to apply the new law and afforded interested parties an opportunity to comment on the changes.

We do not agree that ATA did not have an opportunity to comment on the impact of the changes made by the Deregulation Act of 1978. The Board's notice of proposed rulemaking expressly stated that late-filed comments would be considered to the extent that it was practicable to do so. The 1978 Deregulation Act had been adopted by Congress and the White House had announced the date on which the President would sign the bill before the Board heard oral argument on the proposed rules.[39] The Board's final rules were not adopted until two weeks after the President signed the bill into law. ATA or any other interested party had ample opportunity to comment on the effects of the changes made by the Deregulation Act or even petition the Board to allow an opportunity for a new round of comments. ATA's claim of procedural deprivation is therefore without substantial merit.

Moreover, we do not agree with ATA's claim that changes made by the Deregulation Act required the Board to reissue its notice of proposed rulemaking. If anything, the changes made by the Deregulation Act provided further support for the Board's proposal to terminate its review of carrier agreements. For example, Congress amended Section 416(b) in a manner that broadened the Board's exemption authority.[40] As such ATA's assertion that the 1978 Deregulation Act made the Board's notice of proposed rulemaking obsolete is invalid.[41]

It is, of course, entirely possible that the failure of ATA and its member carriers to comment on the Board's proposal to terminate agreement filing as well as the impact of the 1978 Deregulation Act was a conscious tactical decision, made in order to enhance their chances of persuading the court to remand the Board's regulations.

**39.** In fact, the effects of the 1978 Deregulation Act were discussed during the oral argument. JA 213–214 (Statement of Emery Air Freight).

**40.** *See* 618 F.2d at 825 *supra.*

**41.** Intervenor Wards argues that the Board's rulemaking procedures were inadequate because the time allotted for oral argument was too short to provide interested parties an opportunity to present their views. However, in light of the Supreme Court's admonition in *Vermont Yankee Nuclear Power Corp. v. Natu-* *ral Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), that the Administrative Procedure Act "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures," there is no basis for requiring the Board to go beyond the requirements of the APA. Moreover, by providing interested parties with the opportunity to present oral argument even though it was not required to do so, the Board gave the parties "a significantly greater opportunity to persuade and enlighten" than is normally given parties to a rulemaking proceeding. *American Airlines, Inc. v. CAB,* 359 F.2d 624, 632 (D.C.Cir.) (*en banc*), *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

We therefore turn to ATA's substantive challenges to the agreement filing exemption.

## B

ATA argues that the Board is not authorized to use its exemption authority to prohibit carriers from filing agreements with the Board, seeking Board approval for these agreements, and requesting antitrust immunity. Petitioner argues that the Board is only allowed to grant exemptions from the Act's *requirements*. When Congress amended Section 412(c) in 1978, it made the filing of agreements with the Board optional rather than mandatory; therefore, ATA argues, the Board is not authorized to exempt carriers from the agreement filing provisions. Furthermore, ATA contends that the Board's authority to exempt airlines from certain requirements cannot be used to *prohibit* airlines from filing agreements and seeking Board approval, if they choose to do so. ATA also argues that the Board's action has deprived the carriers of their statutory right to seek Board approval of their agreements, and possibly to obtain antitrust immunity for the agreements pursuant to Section 414. Finally, ATA maintains that the Board's action constitutes an impermissible attempt to absolve itself of its statutory responsibilities.

We do not agree with ATA's suggestion that the Board violated the statute by exempting carriers from filing agreements. First, an examination of the exemption provisions of the Act refutes the claim that the Board is only authorized to exempt carriers from the Act's *requirements*. Section 416(b) authorizes exemptions from "the requirements of * * * [the Act] *or any provision thereof* * * *." Pub.L.No.95–

504 § 31(a) (emphasis added). Similarly, Section 418(c) permits the Board to grant exemptions from "the requirements of [Section 401(a)] * * * and *any other section of this chapter* which the Board by rule determines appropriate * * *." 49 U.S.C. § 1388(c) (Supp. I 1977) (emphasis added). Moreover, ATA's suggestion that the Board's action deprives carriers of a statutory right rests on the mistaken assumption that Congress amended Section 412(c) to make the filing of inter-carrier agreements optional in order to grant carriers a statutory right. Nothing in the legislative history of the amendments suggests that this was Congress' intention. The changes Congress made in Sections 412(c) and 414 were part of its moves to deregulate the air transportation industry. They eliminated the previous practice whereby the Board had to approve or disapprove most inter-carrier agreements, and agreements approved by the Board were automatically granted immunity from the antitrust laws. These amendments were designed to reduce Board regulation of the air cargo industry and promote competition, not to grant carriers a statutory right to apply for Board approval or antitrust immunity.[42] The Board's attempt to further reduce the amount of regulation through use of its broad exemption powers is quite consistent with Congress' purpose in enacting the amendments. Indeed, it promotes Congress' purposes in making the changes. Consequently, we find nothing in the amendments to Sections 412 and 414 that precludes the Board's action.[43]

## VII. CONCLUSION

Because we conclude that the Board had ample authority to issue the challenged regulations and that its decision to do so was

42. The Senate Report stated:

The Air Transportation Regulatory Reform Act would amend present law by changing the mandatory requirement that every agreement—even the most innocuous ones—must be approved in advance by the Board. Under the new law, carriers would not be required to file agreements with the Board, but could not receive immunity from the antitrust laws

without Board approval of each agreement. In this way the regulatory burden on the carriers will be lessened. * * *

S.Rep.No.95–631, 95th Cong., 2d Sess. 82 (1978).

43. ATA also suggests that the Board's decision to terminate the filing of inter-carrier agreements was arbitrary and capricious. We find no merit to this claim.

not arbitrary and capricious, we reject the petitioners' suggestions that the challenged regulations must be invalidated. Accordingly, the CAB's decision is

*Affirmed.*