In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1906

Tommy R. Schroeder,

Plaintiff-Appellant,

v.

Hamilton School District, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 1270--William E. Callahan, Jr.,
Magistrate Judge.

Argued October 26, 2001--Decided March 11, 2002

Before Posner, Manion, and Diane P. Wood,
Circuit Judges.

Manion, Circuit Judge.  Tommy Schroeder,
a school teacher, filed suit against his
former employer, the Hamilton [Wisconsin]
School District, the school district
administrator, and several staff
administrators (including school
principals and human resource directors),
pursuant to 42 U.S.C. sec. 1983, alleging
that they violated his right to equal
protection by failing to take reasonable
measures to prevent students and parents,
and occasionally fellow staff members,
from harassing him about his
homosexuality. The district court granted
summary judgment for the defendants.
Schroeder appeals, and we affirm.

I.

   In 1990, after teaching for
approximately 15 years in the Hamilton
School District, Tommy Schroeder began
teaching sixth grade at Templeton Middle
School in Hamilton, Wisconsin. Shortly
after arriving at Templeton, Schroeder
disclosed his homosexuality to a few of
his fellow staff members and, during his
second or third year at the school, made
the same disclosure at a public meeting.
This information eventually spread
throughout the Templeton community, and,

beginning with the 1993-94 school year, Schroeder began receiving unpleasant inquiries and crude, occasionally cruel, taunts from students regarding his homosexuality./1

While there were isolated incidents involving parents,/2 as well as some of Schroeder's colleagues,/3 the bulk of the harassment he endured at Templeton came from students. Some of the incidents were rather mild. For example, a fifth-grade girl asked Schroeder to verify a rumor that he was gay. Another student authored a note complaining that she had been disciplined by "the gay man." Finally, other students were found discussing Schroeder's homosexuality during homeroom.

Many of the reported student comments and actions, however, were far worse-- accusations that he had AIDS; astudent calling him a faggot and remarking "How sad there are any gays in the world"; another student physically confronted Schroeder after shouting obscenities at him; catcalls in the hallways that he was a "queer" or a "faggot"; obscenities shouted at him during bus duty; harassing phone calls with students chanting "faggot, faggot, faggot" and other calls where he was asked whether he was a "faggot"; and bathroom graffiti identifying Schroeder as a "faggot," and describing, in the most explicit and vulgar terms, the type of sexual acts they presumed he engaged in with other men. He reported this harassment on several occasions, and the defendants "consequenced" (i.e., a term of art in education circles for student discipline) the students identified with the offensive behavior./4 Much of the harassment, however, was anonymous, and therefore went unpunished. As Patty Polczynski, the associate principal at Templeton, told Schroeder, "[i]t makes it difficult to consequence if you don't know who it is to consequence."

Because of the widespread, anonymous nature of the harassment, Schroeder demanded that the defendants conduct "sensitivity training" to condemn discrimination against homosexuals (presumably for the students at Templeton-- the chief perpetrators of the harassment). Instead, Polczynski, after several meetings with Schroeder,

circulated a memorandum to teachers and other staff noting that students were continuing to use "inappropriate and offensive racial and/or gender-related words or phrases," and that "[i]f you observe or overhear students using inappropriate language or gestures, please consequence them as you feel appropriate . . . ." Schroeder considered this memorandum to be a milquetoast response to the harassment he was receiving, especially in comparison to a previous Polczynski memorandum warning staff that "derogatory racial comments and symbols" were "totally unacceptable" and "contrary to [the school's] efforts to create a positive academic environment for all students." When the harassment continued, Schroeder expressed his frustration to Polczynski, and she responded by telling him that "you can't stop middle school kids from saying things. Guess you'll just have to ignore it."

Finally, after several requests for a transfer, Schroeder was moved to Lannon Elementary School in the fall of 1996, where he taught first- and second-grade classes. After a year's respite, the taunts resumed. This time, however, they came primarily from adults, presumably the parents of students at Lannon. At the beginning of his second year at Lannon, an anonymous memo was circulated by a parent proclaiming, "Mr. Schroeder openly admitted at a district meeting that he was homosexual. Is that a good role model for our 5-, 6- and 7-year-old children?" Schroeder also claims that he began hearing that certain staff members and parents were calling him a pedophile and accusing him of sexually abusing small boys. One parent removed his child from Schroeder's class because of Schroeder's homosexuality. Another parent's fear that Schroeder was a pedophile led defendant Richard Ladd, Lannon's principal, to raise the possibility of "proximity supervision" (i.e., meaning that Schroeder could not be alone with male students). The tires on Schroeder's car were slashed, and he began receiving anonymous, harassing phone calls at home (e.g. "Faggot, stay away from our kids" and "We just want you to know you . . . queer that when we pull out all our kids, you will have no job").

In February 1998, Schroeder, who has a

protracted history of psychiatric problems, experienced a "mental breakdown." On February 11, 1998, Schroeder's last day at Lannon, Ladd approached him about complaints that he had received from some of his students' parents. Schroeder told Ladd that he did not want to talk about it, and that he was resigning. Later that day, Schroeder handed Ladd a letter of resignation. At this point, Ladd offered to arrange for a substitute teacher to take over Schroeder's class and requested that he take some time to think about whether he really wanted to resign. Schroeder declined the request, and never reported to work at Lannon again. Schroeder did, however, apply for medical leave and long-term disability insurance. Pursuant to terms of the collective bargaining agreement between the teacher's union and the Hamilton School District, the district terminated Schroeder's employment at the end of the 1998-99 school year.

Schroeder contends that the harassment he received from students, parents, and fellow teachers/staff members at Templeton and Lannon, coupled with the defendants' failure to properly address the problem, caused him to have a nervous breakdown that ultimately resulted in his termination. He therefore filed suit against the defendants, pursuant to 42 U.S.C. sec. 1983, alleging that they denied him equal protection of the law by failing to take effective steps to prevent him from being harassed on account of his sexual orientation. The parties filed cross motions for summary judgment, and the district court granted summary judgment in favor of the defendants. Schroeder appeals the decision.

II.

We review de novo the district court's decision to grant summary judgment, construing all facts, and drawing all reasonable inferences from those facts, in favor of Schroeder, the non-moving party. Johnson v. Univ. of Wisconsin-Eau Claire, 70 F.3d 469, 477 (7th Cir. 1995). Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Schroeder argues that the defendants discriminated against him because of his sexual orientation, in violation of the Equal Protection Clause of the Fourteenth Amendment/5 and 42 U.S.C. sec. 1983./6 According to Schroeder, the defendants treated him differently when addressing his complaints of harassment. He contends that the differential treatment was motivated by his homosexuality, and that the defendants were deliberately indifferent to the constant harassment he received from students and their parents.

In order to establish an equal protection violation, Schroeder must show that the defendants: (1) treated him differently from others who were similarly situated, (2) intentionally treated him differently because of his membership in the class to which he belonged (i.e., homosexuals), and (3) because homosexuals do not enjoy any heightened protection under the Constitution, see, e.g., Romer v. Evans, 517 U.S. 620, 634-35 (1996); Bowers v. Hardwick, 478 U.S. 186, 196 (1986), that the discriminatory intent was not rationally related to a legitimate state interest. Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys., 274 F.3d 1174, 1183 (7th Cir. 2001); Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996). As we noted in Nabozny v. Podlesny,

The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

Id. at 453-54 (citation omitted).

Therefore, "[a] showing that the defendants were negligent will not suffice." Nabozny, 92 F.3d at 454. For Schroeder's claim to withstand summary

judgment, he must show that there is a genuine issue of material fact as to whether the defendants "acted either intentionally or with deliberate indifference" to his complaints of harassment because of his homosexuality. Id. The district court's decision to grant the defendants' motion for summary judgment of this claim must be sustained if the defendants demonstrate that they did not deny Schroeder equal protection on account of his sexual orientation, or that they had a "rational basis" for doing so. Id.

Schroeder attempts to side-step this analysis completely by inviting us to "hold explicitly that Title VII analysis/law shall apply in sec. 1983 cases where discrimination in employment is the basis for the claimed Equal Protection violation." Were this a Title VII case, the defendants could be liable to Schroeder if he demonstrated that they knew he was being harassed and failed to take reasonable measures to try to prevent it. See, e.g., Hall v. Bodine Elec. Co., 276 F.3d 345, 356 (7th Cir. 2002). Title VII does not, however, provide for a private right of action based on sexual orientation discrimination. See, e.g., Spearman v. Ford Motor Co., 231 F.3d 1080, 1086 (7th Cir. 2000); Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc., 224 F.3d 701, 704 (7th Cir. 2000). As such, to the extent Schroeder seeks to have this court judicially amend Title VII to provide for such a cause of action, we decline to do so. It is wholly inappropriate, as well as constituting a clear violation of the separation of powers, for this court, or any other federal court, to fashion causes of action out of whole cloth, regardless of any perceived public policy benefit. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998) ("'the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts.'") (citation omitted). Furthermore, even if Title VII provided a private right of action based on sexual orientation discrimination, sec. 1983 does not provide a remedy for rights created under Title VII. See, e.g., Trautvetter v. Quick, 916 F.2d 1140, 1149 n.4 (7th Cir. 1990); Gray v. Lacke, 885

F.2d 399, 414 (7th Cir. 1989). Finally, to the extent that Schroeder would like us to import Title VII employment discrimination standards into our traditional equal protection analysis, we decline the invitation.

We now turn our attention to Schroeder's secondary argument--that even under a traditional equal protection analysis, the district court's decision must be reversed. Schroeder claims that he presented sufficient evidence to establish that the defendants treated his complaints of harassment differently because of his homosexuality. His primary contention is that the defendants failed to address his complaints in the same manner that they handled complaints of harassment based on race or gender. However, as the district court correctly noted, "[i]n this case there is scant evidence that the incidents involving Schroeder were treated differently from those involving other teachers." Instead, Schroeder would have us infer differential treatment because: (1) a memorandum circulated by the associate principal at Templeton, Patty Polczynski, failed to address and condemn the widespread use by students of "hetero-sexist" and "anti-gay" comments in the same manner that a previous memorandum had done with respect to racist comments and symbols, and (2) while the Hamilton School District held several district-wide staff/teacher training sessions and conducted annual student orientation programs to implement its policies prohibiting race and sex discrimination, the district never held similar training sessions or student programs to address sexual orientation discrimination.

These events do not, however, demonstrate that Schroeder was treated differently from his non-homosexual colleagues, or that he was discriminated against on the basis of his homosexuality. First, as Schroeder acknowledges, the initial memorandum circulated by Polczynski was generated in response to the pervasive use of racist comments and symbols by students in the Hamilton School District. Polczynski explained her motivation for circulating the memorandum in the memorandum itself, noting that the derogatory racial comments being made by students were "contrary to [the school's] efforts to

create a positive academic environment for all students." Additionally, the district-wide staff/teacher training sessions on race discrimination, referred to in Schroeder's appellate briefs, were conducted in the early 1990's when the Hamilton School District began busing black students into its schools from the Milwaukee County Schools. The training sessions and student orientation programs were conducted to ensure that incoming minority students were not subjected to racial discrimination, and to increase sensitivity to racial issues among school district personnel and students. By citing these examples, Schroeder attempts to set up a false dichotomy--i.e., disparity of treatment/protection given to blacks/women as compared with homosexuals. In reality, these examples merely demonstrate the school district's priorities for use of time and resources in favor of its students. And this is certainly understandable given the limited resources of today's public schools.

Furthermore, in a school setting, the well-being of students, not teachers, must be the primary concern of school administrators. Not only are schools primarily for the benefit of students, but it is also clear that children between the ages 6 to 14 are much more vulnerable to intimidation and mockery than teachers with advanced degrees and 20 years of experience. Likewise, with this vulnerability in mind, school administrators must be particularly steadfast in addressing and preventing any form of verbal or physical harassment/abuse directed at their students. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999) (where Supreme Court held that schools receiving federal funding can be held liable under Title IX for deliberate indifference to known acts of student-on-student sexual harassment). See also Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 466-67 (7th Cir. 2001) (court upheld a school principal's decision prohibiting a Bible Club from including a cross as part of a mural display, where the principal's decision was based on a legitimate fear that the approval "of so salient a Christian symbol . . . might . . . require him to approve murals of a Satanic or neo-Nazi character, which would cause an uproar."). They must also

be cautious about using police tactics to deal with nonviolent harassment of a teacher by students, even if that harassment is offensive and cruel.

Schroeder also points to the manner in which the defendants responded to his complaints about the harassment he received during "bus duty" as yet another example of differential treatment and deliberate indifference. He contends that this harassment was especially intense. It is uncontested that Schroeder requested to be removed from bus duty, and that his request was denied by school administrators. There is nothing in the record, however, indicating that, in denying his request, the school administrators treated Schroeder differently from similarly situated non-homosexual teachers. Schroeder contends, however, that Polczynski admitted during her deposition that if a female teacher had been subjected to the same type of harassment, she would have responded differently. The deposition testimony Schroeder relies upon in support of this assertion, however, does not support his claim. As the district court properly noted,

Polczynski testified that, when the students could be identified they were removed from the bus and questioned. She also testified that, when the students could not be immediately identified, she did not remove every student from the bus (which typically would have been about 60 students) and question them individually. Polczynski did not, however, testify that she would have questioned each student on the bus in the hypothetical case involving the female teacher.

In any event, even were we to presume differential treatment, the fact that the defendants failed to remove Schroeder from bus duty does not establish that they were deliberately indifferent to his complaints.

Schroeder cites an incident involving vulgar student-authored bathroom graffiti as additional evidence of differential treatment. While admitting that school administrators identified and punished the offending students, he claims that the school's response to the situation deviated from its normal policies and procedures. The district court

determined, however, that Schroeder's assertion of differential treatment in this case was supported only by "essentially self-serving assertions" and inadmissible hearsay. The district court, therefore, ruled that Schroeder "failed to make a showing sufficient to enable a reasonable trier of fact to find that he was treated differently."/7 Having reviewed the record, we concur with the district court's conclusion in this regard. Furthermore, the fact that thedefendants promptly addressed the situation (i.e., removed the graffiti), and punished the offending students, forecloses the possibility of any inference that they were deliberately indifferent to the harassment.

Finally, Schroeder contends that the defendants discriminated against him because the Hamilton School District had policies against race and sex discrimination, but did not have one against sexual orientation discrimination. While this is most certainly true, the lack of such a policy is not evidence that the defendants were deliberately indifferent to his complaints of harassment. As previously noted, unlike blacks and women, homosexuals are not entitled to any heightened protection under the Constitution. Therefore, discrimination against homosexuals, or for that matter the elderly, overweight, undersized, or disfigured, will only constitute a violation of equal protection if it lacks a rational basis. See, e.g., Romer, 517 U.S. at 634-35 (where Supreme Court held that a state constitutional provision violated the Equal Protection Clause because it was motivated by a baseless hostility to homosexuals). Here, there is no evidence that the defendants' decision not to implement a separate policy against sexual orientation discrimination was based on any animus toward Schroeder or homosexuals in general. Schroeder appears to suggest, however, that the only way the defendants could have prevented the harassment was by requiring all Hamilton School District personnel and students to attend mandatory training sessions on sexual orientation discrimination. There are several problems with this argument.

First of all, it is hardly reasonable to expect a school district to devote a

substantial amount of resources to curb the harassment of one teacher, regardless of the basis for the harassment. In this case, other than Schroeder's situation, there is no evidence of any discrimination against homosexual teachers or students in the Hamilton School District. Instead, the evidence shows that one teacher, who happened to be a homosexual, was harassed because of his homosexuality. As emphasized in Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289, 300-01 (6th Cir. 1997), another decision involving a claim of denial of equal protection on grounds of sexual orientation discrimination, it is not irrational to prioritize protective activities. It is in fact unavoidable, because of limitations of time and other resources. Cf. Wayte v. United States, 470 U.S. 598, 607 (1985); United Air Lines, Inc. v. Civil Aeronautics Bd., 766 F.2d 1107, 1113 (7th Cir. 1985). If, as in the Hamilton School District, race relations are a particularly sensitive area, it is not irrational for school administrators to devote more time and effort to defusing racial tensions among many students than to preventing harassment of one homosexual teacher. However, even if the defendants had been inclined to devote more resources to prevent Schroeder from being harassed, it is hard to see how teaching the district's teachers and staff about sexual orientation discrimination would have prevented the primary perpetrators, the students and their parents, from harassing him. In any event, the staff and faculty were aware of the problem. But disciplining the students identified as perpetrators was, in Schroeder's view, not a sufficient response.

Schroeder's exhortation to adopt a specific policy requiring students to be sensitive to, or accepting of, homosexuals is especially problematic in an elementary or early middle school (i.e., sixth grade) setting. What would such a policy say? It is relatively simple to explain to a child that he or she should not criticize or offend someone because of the color of their skin, or because they are a boy or a girl. This is why blacks and women are described as "discrete and insular" groups. See, e.g., Hicks v. Resolution Trust Corp., 970 F.2d 378, 382 (7th Cir.

1992). Unfortunately, there is no simple way of explaining to young students why it is wrong to mock homosexuals without discussing the underlying lifestyle or sexual behavior associated with such a designation.

Schools can, however, teach their students that it is wrong to mock anyone, for any reason. School administrators can, and should, insist that students behave in a courteous and respectful manner toward their teachers and other students. Such a policy would not require any discussion of homosexuality, or any other characteristic or behavior associated with it. If a student calls a teacher or another student a "faggot," he should be disciplined for violating the school's general civility code. If a student assaults a faculty member or another student because he is a homosexual, or because he is overweight, disfigured, undersized, or aged, he should be suspended or expelled for the assault. Students who are inconsiderate, disrespectful, mean, or even vicious, to others should be "consequenced" for what they do, not for the underlying motivation. Students must be taught--at school if not at home--that it is reprehensible to cruelly mock and malign staff members and other students--for any reason. In this case, the record is clear: When school administrators determined that a student harassed Schroeder by using derogatory terms like "faggot," the student was punished. By punishing these students, the defendants made it abundantly clear to the student population that such terms were totally unacceptable in polite society. This is all that was required of them.

That being said about disrespectful students, a short word about difficult parents. Schroeder asserts that he was also harassed by parents, and that the defendants did nothing about it because of his homosexuality. In support of his claim, Schroeder points to a memorandum, apparently circulated by a parent, which questions his qualifications to teach and criticizes the school's decision to blend first- and second-grade classes. The first paragraph alerted parents to the fact that Schroeder was an admitted homosexual, and presented the rhetorical question, "Is this a good role model for five-, six- and seven-year-old children?"

Schroeder, like any well-qualified teacher, should be a good role model for his students, not because he is homosexual, but because he is an effective and enthusiastic teacher who wants them to learn. Regardless of the parental attitude displayed in the memorandum, however, school administrators have little or no power to "consequence" the parents of students. Obviously, if a child picks up foul language and prejudicial views from his parents at home, and then displays them at school, he should be disciplined. A student cannot, however, be disciplined for expressing a home-taught religious belief that homosexual acts are immoral. See, e.g., Tinker v. De Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512-13 (1969) (holding that students "may express [their] opinions, even on controversial subjects . . . if [they do so] without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others.") (citation omitted); Muller by Muller v. Jefferson Lighthouse Sch., 98 F.3d 1530, 1536 (7th Cir. 1996) (holding that "religious speech cannot be suppressed solely because it is religious (as opposed to religious and disruptive or hurtful, etc.) . . . in the elementary school environment."). Administrators have to tiptoe on a narrow path when dealing with a child's unwarranted prejudices as opposed to his sincerely held religious beliefs. Beyond that, the Equal Protection Clause does not require a school district to do anything about parental unpleasantries unless they take place on school grounds. Schroeder could have reported the anonymous harassing phone calls he received, presumably from parents, to the telephone company, and any threats of physical violence to the police. School administrators have little authority to control parental activity.

To prevail, Schroeder needed to demonstrate that the defendants were deliberately indifferent to his complaints. He has conceded, however, that the defendants took some action in response to nearly all of his complaints. Nevertheless, as the district court noted, "[a]t times, the plaintiff appears to be taking the position that the defendants are liable merely because the

disciplinary and investigative measures they took were less than 100 percent effective." The defendants' failure to address, to Schroeder's satisfaction, his complaints of harassment does not, however, establish an equal protection violation. Given that the majority of the harassment at issue in this case was anonymous, we are skeptical about whether the defendants could have done much more to prevent the harassment without expending a disproportionate commitment of resources, or fashioning a draconian response that would unnecessarily infringe on the rights of the non-offending students.

The question in this case is not whether the defendants did enough to engender a more positive attitude among its students and staff toward homosexuality. Rather, the only issue is whether the manner in which the defendants handled Schroeder's complaints of harassment denied him equal protection under the law. School administrators disciplined the identified students who misbehaved and degraded him, and made an effort to discover those not identified. There is no evidence that the defendants were deliberately indifferent to his situation, or that they did not make a sincere effort to deal with his complaints./8 On the contrary, the record shows that the school district was genuinely concerned about the treatment Schroeder experienced, and that it did what reasonably could be expected under the circumstances. The record is replete with memos, correspondence, and testimony indicating that various administrators and staff positively responded to his requests. In the absence of deliberate indifference, federal judges should not use rational basis review as a mechanism to impose their own social values on public school administrators who already have innumerable challenges to face.

Schroeder's breakdown and his current psychological condition are unfortunate. To the extent that student and parental harassment of him exacerbated his long history of personal and psychological problems, that is also unfortunate. There is, however, no evidence that the defendants denied him the equal protection of the law.

III.

Schroeder failed to demonstrate that the defendants treated his complaints of harassment differently from those lodged by non-homosexual teachers, that they intentionally discriminated against him, or acted with deliberate indifference to his complaints because of his homosexuality. The district court, therefore, properly granted the defendants' motion for summary judgment.

AFFIRMED.

FOOTNOTES

/1 On appeal, Schroeder cites only one incident of harassment as having occurred prior to the 1993-94 school year. He claims that in 1989 an eighth-grade student called him a "stupid faggot," and told him that he was "going to blow [his] . . . head off."

/2 For example, in 1995, the father of one student told Schroeder, "I don't want queers teaching my son."

/3 Schroeder contends that one teacher was overheard saying that Schroeder was gay and that his former lover had died of AIDS. Another teacher allegedly called a friend of Schroeder's "a flaming homo-sexual." Schroeder claims that his "sexual orien-tation was the topic of gossip and innuendo among teachers [at Templeton]," and that he was told by others that some teachers were making derogatory remarks about him. One of the principals at Templeton made derogatory remarks about gays and lesbians (although his remarks were apparently not directed at Schroeder or done in his pres-ence). Schroeder has conceded, however, that none of the individual defendants ever made derogatory comments about him personally or his sexual orientation. He also testified at his deposition that no teacher or staff member at Templeton ever harassed him on a daily basis. Finally, Schroeder has admitted that he refused to disclose the names of staff members who he claims harassed him on occasion.

/4 For example, the students who "graffiti-bombed" the bathroom were punished for vandalism.

/5 The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV sec. 1.

/6 42 U.S.C. sec. 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

/7 Schroeder's attorney even acknowledged that "uncovering evidence of differential treatment based on comparison was difficult."

/8 Our conclusion that the defendants did not act with deliberate indifference to Schroeder's complaints obviates the necessity of addressing his argument that the defendants are also subject to sec. 1983 liability under Monell v. New York City Dept. of Soc. Services, 436 U.S. 658, 694 (1978), and its progeny.

Posner, Circuit Judge, concurring.  I join Judge Manion's opinion without reservations but write separately to emphasize that our decision would have to be the same even if Schroeder were right that the school administrators' response to his complaints about the harassment to which he was subjected was tepid in comparison to their response to signs of racial prejudice, so that they were in a sense, though a severely attenuated one, "discriminating" in favor of blacks by giving blacks more protection than they were giving this homosexual teacher.

From a historical standpoint the core violation of the equal protection clause is indeed the selective withdrawal of police protection from a disfavored group, as the term "equal protection of the laws" connotes. E.g., DeShaney v. Winnebago County Dept. of Social Services, 812 F.2d 298, 301 (7th Cir. 1987), affirmed, 489 U.S. 189 (1989); Bohen v. City of East Chicago, 799 F.2d 1180, 1190 (7th Cir. 1986) (concurring opinion); David P. Currie, "The Constitution in the Supreme Court: Limitations on State Power, 1865-1873," 51 U. Chi. L. Rev. 329, 353-54 & n. 144 (1984). It is this principle that Schroeder tries to fit himself within. If police decide not to protect blacks from criminals, but to protect whites, that is a denial of equal protection. Palmer v. Thompson, 403 U.S. 217, 220 (1971); Hilton v. City of Wheeling, 209 F.3d 1005, 1007 (7th Cir. 2000). And likewise a public school that decides not to protect black students from being harassed by other students, but to protect white students from such harassment, denies equal protection. Gant ex rel. Gant v. Wallingford Board of Education, 195 F.3d 134, 139-40 (2d Cir. 1999). But Schroeder is not black. Blacks are one

of the groups that the Supreme Court has decided deserve special protection against discrimination by public entities. (Women too--cases like Gant but concerning failure to protect women equally with men from sexual harassment are illustrated by Reese v. Jefferson School District No. 14J, 208 F.3d 736, 740 (9th Cir. 2000). But Schroeder is no more a woman than he is a black. He is a white male.) Deliberate discrimination on racial grounds by a public body is unlawful unless a compelling case of public need is shown, unless, that is, in the lingo of the cases, the discrimination can survive "strict scrutiny."

Homosexuals have not been accorded the constitutional status of blacks or women. This does not make them constitutional outlaws. Any group, or for that matter any individual (as the "class of one" equal protection cases establish, e.g., Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam); Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001); Hilton v. City of Wheeling, supra, 209 F.3d at 1007; Shipp v. McMahon, 234 F.3d 907, 916 (5th Cir. 2000)), has a right not to be victimized by an irrational withdrawal of state protection. But the word "irrational" is the key to determining the scope of this principle. Discrimination against homosexuals by public entities violates the equal protection clause only if it lacks a rational basis, as it would do if it were motivated by baseless hostility to homosexuals, the motivation that the Supreme Court in Romer v. Evans, 517 U.S. 620, 634-35 (1996), attributed to a state constitutional provision that forbade municipalities to enact gay-rights ordinances; see also Stemler v. City of Florence, 126 F.3d 856, 874 (6th Cir. 1997), or if, though devoid of animus, the discrimination simply bore no rational relation to any permissible state policy.

Schroeder has not presented evidence from which a reasonable jury could infer that the defendants, which is to say the school and the school authorities as distinct from students and parents, were hostile to Schroeder because he was a homosexual (were hostile to him, period), although the character of the defendants' response to his complaint may have been influenced by the hostility of some parents to the idea of their kids' being taught by a homosexual. As for whether the defendants would have been irrational in failing to protect a homosexual teacher as assiduously as they would have protected a black or female teacher subjected to the same amount of abuse, a number of considerations show that they would not have been. The first is that, as pointed out in another decision involving a claim of denial of equal protection on grounds of sexual orientation, Equality Foundation of Great-

er Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289, 300 (6th Cir. 1997), it is not irrational to prioritize protective activities. It is in fact unavoidable, because of limitations of time and (other) resources. Cf. Wayte v. United States, 470 U.S. 598, 607 (1985); United Air Lines, Inc. v. Civil Aeronautics Bd., 766 F.2d 1107, 1113 (7th Cir. 1985). If race relations are a particularly sensitive area in a particular school, the school authorities are not irrational in deciding to devote more time and effort to defusing racial tensions than to preventing harassment of a homosexual (or overweight, or undersized, or nerdish, or homely) teacher.

It is true that the out-of-pocket costs of some additional measures that the defendants might have taken, for example adding to every memo warning against discrimination on grounds of race the words "or sexual orientation," would have been slight. But such an addition would have had a negligible effect without amplification--except perhaps to dilute the warning against racial discrimination. The more amplification, moreover, the greater the dilution--which shows that the measure would not have been costless after all.

Second, when most of the abuse directed at a person is anonymous, the school authorities may be unable to prevent it without a disproportionate commitment of resources to the effort or a disproportionate curtailment of student rights. Indeed, as Judge Manion's opinion properly emphasizes, a public school's primary commitment is to its students, not to its teachers, and this limits the extent to which it must use police tactics to deal with nonviolent, though offensive and wounding, harassment of a teacher by students.

Third, as also properly emphasized by Judge Manion, when harassment of a teacher or a student is based upon his sexual orientation or activity, the school authorities' options are limited by an understandable reticence about flagging issues of sex for children. It is true that many experts on education think it best to inform children about sex as early and as thoroughly as possible, in order to minimize disease and pregnancy risk; that certainly has been the trend in the wake of the AIDS epidemic. Douglas Kirby et al., "School-Based Programs to Reduce Sexual Risk Behaviors: A Review of Effectiveness," 109 Public Health Report 339 (1994). But it is possible for a rational school administration to fear that if it explains sexual phenomena, including homosexuality, to schoolchildren in an effort to get them to understand that it is wrong to abuse homosexuals, it will make children prematurely preoccupied with issues of sexuality.

Fourth, it is a mistake automatically to equate favoritism to discrimination. The difference is that while discrimination against a group harms the group, favoritism for another group may not harm the nonfavored group, or may harm it too slightly for the law to take notice. Even if the school authorities had no good reason to be as solicitous of the welfare of their black and female students as they were, it would not follow that, had they been less solicitous of them, Schroeder would have benefited; and, if not, then how was he hurt?

The considerations that I have listed did not figure in Nabozny v. Podlesny, 92 F.3d 446 (7th Cir. 1996), on which Schroeder principally relies. A homosexual student was assaulted by other students--physically, not merely verbally--and the school administration did nothing at all. We said: "We are unable to garner any rational basis for permitting one student to assault another based on the victim's sexual orientation, and the defendants do not offer us one." Id. at 458. The rational-basis test is not demanding, but the school there managed to flunk it--and besides there was evidence that the school officials actually "laughed and told Nabozny that Nabozny deserved such treatment because he is gay." 92 F.3d at 452. Such evidence alone could prove animus and thus obviate any need to prove the absence of a rational basis for the discrimination, and it figured importantly in the court's holding. See id. at 455. Moreover, it was a case of violence against a student, not verbal abuse of a teacher.

The administration of the public schools of this country in the current climate of rancid identity politics, pervasive challenges to authority, and mounting litigiousness is an undertaking at once daunting and thankless. We judges should not make it even more daunting by injecting our own social and educational values in the name of "rationality review." So while in hindsight it appears that the defendants could have done more to protect Schroeder from abuse, it is equally important to emphasize that lackluster is not a synonym for invidious or irrational. There is no evidence that the defendants were hostile to Schroeder because of his sexual orientation-- or because of anything else, for that matter. And they cannot be said to have been irrational in failing to do more than they did, as there were rational considerations counseling against more vigorous action.

 Diane P. Wood, Circuit Judge, dissenting.  In this case, the majority holds that Tommy Schroe-

der, an openly homosexual teacher who was subjected to severe harassment on the job, cannot survive summary judgment on his claim under 42 U.S.C. sec. 1983 that defendant Hamilton School District and some of its administrators violated his rights under the Equal Protection Clause of the United States Constitution. In my view, this holding and the rationale both the majority and concurrence have used to reach it are inconsistent with the Supreme Court's recognition in Romer v. Evans, 517 U.S. 620 (1996), that the Equal Protection Clause does protect homosexuals as a class and that this protection may not be denied simply because they may be an unpopular class in a given state or local community. I therefore respectfully dissent.

Because the majority has already furnished many of the relevant facts, I will simply highlight those that appear especially important to me. First, there is no dispute that Schroeder was a very good teacher; he taught successfully for the District for 22 years. Whatever psychiatric problems he may have had, see ante at 5, 17 (majority opinion), it is clear that he had them under control until the unrelenting harassment to which he was subjected on the job caused him to have a full mental breakdown on February 11, 1998. He left the school that day a ruined man; when it became apparent that he could not return, the District terminated him. His vulnerability in no way excuses the District for the well-known reason that tortfeasors take their victims as they find them. See Restatement (Second) of Torts sec. 461 (1986 App.); see also Brackett v. Peters, 11 F.3d 78, 81 (7th Cir. 1993) ("It has long been the rule in tort law (the 'thin-skull' or 'eggshell-skull' rule) not only that the tortfeasor takes his victim as he finds him, but also that psychological vulnerability is on the same footing with physical.").

In addition, Schroeder complained repeatedly to the school officials about the vicious harassment the students and occasionally others directed toward him. Compare Frazier v. Delco Electronics Corp., 263 F.3d 663, 666 (7th Cir. 2001); Haugerud v. Amery School Dist., 259 F.3d 678, 700 (7th Cir. 2001); Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998) (all recognizing that an employer is only liable under Title VII for co-worker harassment if it is negligent, and that this normally means the employee must bring the harassment to the employer's attention). See also Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999) (holding that private damages are available in a suit based on Title IX of the Education Act only where the funding recipient acts with deliberate indifference and the harassment is so severe, pervasive, and

objectively offensive that it effectively bars the victim's access to the educational benefit or program). His efforts to alert the District to the problem and to seek redress eliminate any possibility of the District's defeating this claim of intentional discrimination through a claim of lack of knowledge.

Despite the majority's efforts to find remedial efforts in the District's generalized responses, it is plain that the District never in any way took action specifically designed to inform the students that certain words or phrases that reflect negative views about homosexuals were out-of-bounds, nor in any other way did it tell them that harassment or discrimination based upon Schroeder's sexual orientation was impermissible. It would have been easy enough, as part of the philosophy of "courtesy to all" that the majority advocates, to prohibit certain words or actions without a detailed discussion of the sexual behavior of adults.

Finally, the District treated the class of homosexuals differently from the way it treated other classes, such as racial minorities or gender, as illustrated by the memorandum it circulated cautioning the community to avoid "offensive racial and/or gender related words or phrases." Even the majority concedes this, ante at 12, when it admits that the District had no policy against discrimination based on sexual orientation and did have such policies against other forms of discrimination. Since even this court believes that discrimination based on sexual orientation is not "gender-related," see, e.g., Spearman v. Ford Motor Co., 231 F.3d 1080, 1084 (7th Cir. 2000), there is every reason to think that the students of the Hamilton School District might have thought the same thing and concluded that the District's policy did not require them to avoid what is often referred to as gay-bashing.

The majority acknowledges that the core violation of the Equal Protection Clause is "precisely the selective withdrawal of police protection from a disfavored group . . . ." Ante at 18 (concurrence). See also Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam) (recognizing that even a "class of one" may state a claim under the Equal Protection Clause). It also appears to admit that homosexuals might constitute one such group. Ante at 7 (majority opinion); ante at 19 (concurrence). Indeed so, as the Supreme Court's Romer decision makes clear. And, it is worth noting that Romer is the only decision from the Supreme Court in recent years to address an equal protectionargument where the class of homosexuals were singled out for unique-

ly disfavored treatment. Bowers v. Hardwick, 478 U.S. 186 (1986), looked only at the question whether the enforcement of the Georgia sodomy statute violated the fundamental rights (meaning substantive due process rights) of homosexuals in that state. The Court was careful to note that it was not addressing any equal protection argument. See id. at 202-03 n.2. In Webster v. Doe, 486 U.S. 592 (1988), the Court considered the question whether an avowedly homosexual man could bring a lawsuit against the Director of Central Intelligence, who had fired him expressly because he was homosexual. The Court concluded that the plaintiff had no claim under sec. 102(c) of the National Security Act, 50 U.S.C. sec. 403(c), because the Director's termination decisions were committed to agency discretion (as that term is used in the Administrative Procedures Act, 5 U.S.C. sec. 701), but it remanded for further proceedings on the plaintiff's constitutional claims, including his claim based on the Equal Protection Clause. The later case of Boy Scouts of America v. Dale, 530 U.S. 640 (2000), dealt with the question whether the First Amendment associational rights of the Boy Scouts organization would be infringed if it was compelled to accept a scout leader it did not want. In that case, the reason the Boy Scouts did not want respondent Dale in its organization was Dale's sexual orientation. But the Equal Protection Clause naturally enough did not figure in the Court's opinion because the Boy Scouts is a private organization and thus not a "state actor" for purposes of the Fourteenth Amendment. That leaves us with Romer as the governing Supreme Court decision on the applicability of the Equal Protection Clause to the class of homosexuals.

Nothing in Romer justifies a system under which a state or state actors like the District and its officials deliberately either omit altogether or give a diminished form of legal protection from verbal or physical assaults to individuals in certain disfavored classes. Yet both the majority opinion and the concurrence see no problem in the fact that the defendants intentionally responded less vigorously to the abuse that finally broke Schroeder than they themselves would have done for others. In fact, the majority seriously understates the case. Never, in the course of these events, did the administration ever attempt to dissuade either students, parents, or anyone else in the broader community of the school district, to refrain from discrimination or harassment based upon sexual orientation. Indeed, as I have already noted, school officials never even told the students that the words being used to describe Schroeder transgressed the general code of civility the majority is recommending to schools. Schroeder was just told to tough it out.

The majority also makes the unwarranted factual finding that there was no evidence of hostility to Schroeder. Even a glance at the facts the majority itself has set out shows that this is, at a minimum, a disputed point of fact.

Last, the majority seems to believe that a lack of resources might have prevented the District from responding to Schroeder's complaints. See ante at 13 (majority opinion); ante at 20 (concurrence). This cannot be a serious point. Adding two words, "sexual orientation," to the memorandum that was circulated could hardly have added a second to the secretarial time involved, nor could it have added appreciably to the amount of toner consumed by the photocopying machine. This case is nothing like Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289 (6th Cir. 1997), on which both of my colleagues rely heavily. Equality Foundation was a case in which the court upheld the city's refusal to include homosexuals in a specially protected class, whereas here the only thing Schroeder wants is the same treatment that everyone else is receiving--that is, the kind of treatment to which the Constitution entitles him, according to Romer v. Evans. The glaring absence of the words "sexual orientation" in the memorandum, coming on the heels of the offensive incidents and Schroeder's complaint about exactly that kind of harassment, implies official tolerance, if not endorsement, of the behavior in which the students and others had been engaging. As I believe the majority acknowledges, the mere fact that members of some religious groups think that homosexuality is immoral also in no way excuses a public school's tolerance of harassing conduct based on sexual preference. Some religions profess beliefs that are incompatible with the individual guarantees found in the Bill of Rights, as we have seen to our sorrow in the recent history of the Taliban group in Afghanistan, whose views about the role of women in society could never be adopted by a public body here. In this country, nondiscriminatory secular norms of conduct ordinarily prevail even if they conflict with particular religious beliefs or practices. See, e.g., Employment Division v. Smith, 494 U.S. 872, 878-79 (1990); Prince v. Massachusetts, 321 U.S. 158 (1944); Reynolds v. United States, 98 U.S. (8 Otto) 145 (1879).

I do not disagree that each case of harassment or discrimination must be evaluated on its own facts. Nor do I quarrel with the proposition that proper allocation of investigative resources may require devoting less time and effort to some complaints than to others. That decision, however, must be made on a case-by-case basis. Systematically to put cases involving harassment based

on homosexuality (or any other recognized classification) below the threshold for any action at all amounts to the kind of differential unfavorable treatment that the Equal Protection Clause reaches. I had thought that Nabozny v. Podlesny, 92 F.3d 446 (7th Cir. 1996), which the majority hardly discusses and the concurrence attempts to distinguish, settled the point that sexual orientation discrimination could not be treated in such a cavalier fashion.

Schroeder has shown that he suffered harassment so severe that he experienced a total mental breakdown; he has shown that a reasonable trier of fact could find that the school district officials acted intentionally when they failed to respond to his complaints; and he has shown that the trier of fact could also infer that his unfavorable treatment occurred because of his homosexuality. This is more than enough, in my view, to allow him to proceed to trial in his case against the District. I would Reverse the district court's judgment and Remand for that trial.